UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CHRIS LEE and SARA LEE, individually, and on behalf of R.L. and T.L., their minor children,<br><br>        Plaintiffs,<br><br>v.<br><br>NORTHWEST FIBER, LLC, d/b/a ZIPLYFIBER; ZIPLY FIBER OF IDAHO, LLC; ZIPLY FIBER NORTHWEST, LLC; HHS CONSTRUCTION, LLC; PG ENGINEERING MANAGEMENT CORP d/b/a PG CONTRACTORS, LLC a/k/a PG CONTRACTORS ENGINEERING MANAGEMENT CORP; MASTOD'S CONSULTING SERVICES, INC.; AVISTA CORPORATION d/b/a AVISTA UTILITIES; DIEGO VASQUEZ d/b/a ARD UNDERGROUND CONSTRUCTION, DOES 1-10; and DOE ENTITIES 1-10,<br><br>        Defendants. | Case No. 2:23-cv-00075-AKB (lead case)<br><br><br>**MEMORANDUM DECISION AND ORDER** |
| CHRIS LEE and SARA LEE, individually, and on behalf of R.L. and T.L., their minor children,<br><br>        Plaintiffs,<br><br>v.<br><br>DIEGO VASQUEZ d/b/a ARD UNDERGROUND CONSTRUCTION,<br><br>        Defendants, | Case No. 2:23-cv-00480-AKB<br><br>(consolidated) |

NORTHWEST FIBER, LLC, d/b/a ZIPLY FIBER; ZIPLY FIBER OF IDAHO, LLC; and ZIPLY FIBER NORTHWEST, LLC,

       Cross-Claimants,

v.

HHS CONSTRUCTION, LLC; PG ENGINEERING MANAGEMENT CORP d/b/a PG CONTRACTORS, LLC a/k/a PG CONTRACTORS ENGINEERING MANAGEMENT CORP; and MASTOD'S CONSULTING SERVICES, INC.,

       Cross-Defendants.

HHS CONSTRUCTION, LLC,

       Cross-Claimant,

v.

MASTOD'S CONSULTING SERVICES, INC.; PG ENGINEERING MANAGEMENT CORP.,

       Cross-Defendants.

**MEMORANDUM DECISION AND ORDER – 2**

PG ENGINEERING MANAGEMENT CORP.,

     Cross-Claimant,

v.

MASTOD'S CONSULTING SERVICES, INC.,

     Cross-Defendant.

Pending before the Court are multiple motions for summary judgment including Defendants Northwest Fiber, LLC d/b/a Ziply Fiber; Ziply Fiber of Idaho, LLC; Ziply Fiber Northwest, LLC's (collectively Ziply) Motion for Summary Judgment (Dkt. 93); Defendant Avista Corporation's (Avista) Motion for Summary Judgment (Dkt. 94); Defendant HHS Construction, LLC's (HHS Construction) Motion for Summary Judgment against Defendant PG Engineering Management Corp. (PG Engineering) (Dkt. 95); and Plaintiffs' Motion for Partial Summary Judgment (Dkt. 96). For the following reasons, the Court grants in part and denies in part the motions.

## I.   BACKGROUND

### A.   Relationship of the Defendants

This action arises from an explosion that occurred on October 28, 2021, in Rathdrum, Idaho, while Defendants were installing the infrastructure for fiber optic cable in a residential neighborhood (Dkt. 5-1 ¶ 40; Dkt. 112-2 ¶ 2). Ziply obtained a Right-of-Way Encroachment Inspection Permit from the City of Rathdrum (Rathdrum Permit) to install the infrastructure (the Ziply project) (Dkt. 101 at 2, 4). At issue is Ziply's liability and the liability of various subcontractors involved in the Ziply project for the explosion.

MEMORANDUM DECISION AND ORDER – 3

After Ziply obtained the Rathdrum Permit, it contracted with HHS Construction to install the infrastructure in multiple locations, including in the neighborhood where Plaintiffs Chris Lee and Sara Lee (the Lees) and their minor children, R.L. and T.L., resided (Dkt. 108 at 17 n.10). HHS Construction, in turn, contracted with PG Engineering to conduct the underground boring work on the Ziply project (Dkt. 109 at 6; Dkt. 120 at 3–4). PG Engineering then contracted with Defendant Mastod's Consulting Services, Inc. (Mastod's) to perform horizontal directional drilling (Dkt. 109 at 6). Mastod's engaged Diego Vasquez and his crew to conduct the drilling (*id.*). PG Engineering was responsible for on-site supervision during the boring work, although its representative was with a different crew when Vasquez began work near the Lee residence on the day of the explosion (Dkt. 93-2 ¶ 16; Dkt. 98-1 at 283). It is undisputed that before the digging began, the gas line locations had been properly marked (Dkt. 94-1 ¶ 13; Dkt. 93-1 at 18:25–19:17).

**B.      The Incident**

On the morning of October 28, 2021, while engaging in horizontal directional drilling in in front of the Lee residence, Vasquez's crew struck an underground natural gas line, causing a significant gas leak (Dkt. 94-1 ¶ 8). At 10:04 a.m., a member of the work crew informed the Lees, who were in the residence, of the leak (*id.* ¶ 9). The boring crew then tried to cover the line with dirt and rocks (Dkt. 5-1 ¶ 18). At 10:08 a.m., the Lees observed a plume of natural gas and dirt shoot upward out of the line, and at 10:09 a.m., they evacuated the house and called 911 from their backyard (Dkt. 94-1 ¶¶ 11–12).

**C.      Avista's Initial Response**

About the same time, Avista, which is the natural gas provider in the area, was notified about the leak. At approximately 10:05 a.m., Ryan Sager, an Avista employee, received a call reporting the leak (Dkt. 94-1 ¶ 14). Sager alerted Jason Stevens, another Avista employee and a

journeyman gas serviceman, who had over twenty years' experience (*id.* ¶ 19), and Stevens immediately began driving to the scene (*id.* ¶ 21). Stevens was formally dispatched at approximately 10:20 a.m. and arrived on site around 10:40 a.m. (*id.* ¶ 25). Avista's dispatch classified the incident as a priority 1, code 9, indicating blowing or escaping gas (*id.* ¶¶ 23–24).

Once on the scene, Stevens assumed the role of incident commander; coordinated with the fire department personnel who were on the scene; cleared excavators from the area; and investigated the source of the leak (*id.* ¶¶ 27–30). He confirmed that the excavators had not properly potholed the gas line; called dispatch to request additional crew and emergency locates; and shut off the gas to the Lee residence and removed the electric meter (*id.* ¶¶ 30–32).

During the incident, the Lees requested to enter the home to retrieve personal items (Dkt. 5-1 ¶ 20). Stevens escorted them in the residence while actively monitoring gas levels with a handheld combustible gas indicator (CGI); during this time, he detected readings of 0–60 ppm on the main level and 0–600 ppm on the upper level (Dkt. 94-1 ¶ 36–37).

After the Lees exited their residence, Avista personnel continued to monitor the Lee residence and the surrounding area (Dkt. 101 at 9). Dan Holden, an Avista employee, began bar holing[1] approximately six inches from the foundation of the residence using a CGI to detect subsurface gas (Dkt. 94-1 ¶¶ 50–51). These readings showed 0 percent LEL outdoors (*id.* ¶ 51). Avista personnel also ventilated the residence by leaving doors open and continued to monitor gas both inside and outside the affected homes (*id.* ¶¶ 44–47, 50–51).

Later, while the gas flow was still off and the power to the home was disconnected, the Lees requested to return to the residence again (*id.* ¶ 52). At approximately 12:39 p.m., Stevens

---

[1] Bar holing is a method of monitoring for gas in the ground using perforated stakes placed in the ground that test gas levels with a CGI (Dkt. 94-1 ¶ 50).

MEMORANDUM DECISION AND ORDER – 5

re-entered the home with the Lees, conducted a floor-by-floor sweep with his CGI, and detected 0 percent LEL throughout the home, including the garage (*id.* ¶ 53–56). He then proceeded to reinstall the electric meter (*id.* ¶ 57).

### D.    The Explosion

Shortly after Stevens restored the power to the Lee residence, Mr. Lee reported hearing a popping noise from the furnace. Stevens initially turned off the breaker but then turned it back on (Dkt. 94-1 ¶ 60). As he entered the house from the garage, a fireball erupted above his head (*id.* ¶ 62). At that time, Mrs. Lee was upstairs, and Mr. Lee and Stevens were in the garage (*id.* ¶ 63). Both men evacuated through the garage, and Mrs. Lee was later rescued from a second-story window as the fire spread through the Lee residence (*id.* ¶¶ 66, 68).

Mrs. Lee was assessed following the explosion and did not suffer physical injuries (Dkt. 94-2 at 7). Mr. Lee suffered second-degree burns to his arms and neck, and Stevens sustained a first-degree burn on the back of his neck (*id.*). At the time of the explosion, the Lees' minor children, R.L. and T.L., were at school, which is located approximately 645 feet from the Lee residence (Dkt. 108 at 17 n.10). While R.L. observed smoke and fire from the Lee residence, he was not confident it was his house until about 3:45 p.m.—approximately three hours after the incident (Dkt. 94-1 ¶¶ 76, 78). During that time, R.L. had been informed his parents were okay (Dkt. 108-6 ¶¶ 16–17). T.L. did not observe the explosion or learn that it was her house until 3:45 p.m. (Dkt. 108-5 at 7). Neither child knew their parents were in the home at the time of the explosion (Dkt. 94-2 at 7–8).

Plaintiffs bring five causes of action: (1) negligence against all Defendants (Dkt. 5-1 ¶¶ 37–45); (2) negligent hiring, training, and supervision against all Defendants (Dkt. 5-1 ¶¶ 46–49); (3) vicarious liability against Ziply and Avista (Dkt. 5-1 ¶¶ 50–54); (4) negligent infliction of

MEMORANDUM DECISION AND ORDER – 6

emotional distress (NIED) against all Defendants (Dkt. 5-1 ¶¶ 55–57); and (5) joint and several liability against Ziply, HHS Construction, PG Engineering, and Mastod's (Dkt. 5-1 ¶¶ 58–61). Also relevant to the instant motions is HHS Construction's cross-claim against PG for breach of contract (Dkt. 12 ¶¶ 17–21).

## II.    LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is a fact that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The Court must draw all inferences in the light most favorable to the non-moving party. *Id.* at 255. Summary judgment must be denied if the evidence is such that conflicting inferences may be drawn therefrom, and if reasonable people might reach different conclusions. *Nelson v. Kaufman*, 458 P.3d 139, 145 (Idaho 2020).

When cross-motions for summary judgment are filed, the Court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (citation modified*)*; *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating these motions, a court "must consider each party's evidence, regardless under which motion the evidence is offered." *L.V. Sands, L.L.C. v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

## III.    ANALYSIS

### A.    Ziply's Summary Judgment Motion Against the Lees

The Lees allege claims against Ziply for vicarious liability; general negligence; negligent hiring, training, and supervision; NIED; and joint and several liability. Ziply moves for summary

MEMORANDUM DECISION AND ORDER – 7

judgment on each of these claims (Dkt. 93). It argues that the subcontractors (which include HHS Construction, PG Engineering, Mastod's, and Vasquez) are independent contractors for whom Ziply is not vicariously liable and that no exception applies to the general rule that a principal, such as Ziply, is not vicariously liable for an independent contractor's conduct (*see generally id.*).

The Lees oppose Ziply's motion, arguing that exceptions to the general rule apply (Dkt. 110). Specifically, they argue that there are genuine issues of material fact whether Ziply had an agency relationship with the subcontractors. Alternatively, the Lees argue that Ziply breached non-delegable duties imposed by Idaho Code § 55-2207 and the Rathdrum Permit; the Ziply project of constructing a fiber optic infrastructure in the right-of-way of a natural gas main created a peculiar risk of harm; and Ziply negligently selected the subcontractors (*see generally id.*). For the reasons discussed below, the Court grants Ziply's summary judgment motion.

### 1.   Agency Relationship

Ziply argues that it is not vicariously liable for the subcontractors' conduct because it had no agency relationship with them. (Dkt. 93-1 at 5–7, 10–12). It is undisputed that no Ziply personnel were ever on site—either before or after the incident (Dkt. 98-1 at 275; Dkt. 110 at 19). Nevertheless, the Lees argue that Ziply is liable because an agency relationship existed between it and the subcontractors (Dkt. 110 at 11).

Under Idaho law, a principal is generally not liable for the acts of an independent contractor and its employees in the performance of contracted services. *Nelson*, 458 P.3d at 146. One exception to this rule is where an agency relationship exists. *Id.* To establish the existence of an agency relationship, a plaintiff must show (1) the alleged agent had the power to "alter legal relations between the principal and third persons"; (2) the alleged agent had a fiduciary duty to the principal to "act primarily for the principal's benefit in matters connected with [the] undertaking"; and (3) the alleged principal had "the right to control the physical conduct of the agent." *Id.* at 147.

MEMORANDUM DECISION AND ORDER – 8

Whether an agency relationship exists is a question of fact for the jury; however, whether a given set of facts is sufficient to constitute an agency relationship is a question of law. *Humphries v. Becker*, 366 P.3d 1088, 1095 n.2 (Idaho 2016). A court "may, as a matter of law, make a preliminary finding that there are insufficient facts to constitute an agency relationship." *Nelson*, 458 P.3d at 145. The party asserting agency has the burden of proving it exists. *Primera Beef, LLC v. Ward*, 457 P.3d 161, 167 (Idaho 2020).

In support of their theory that the subcontractors were Ziply's agents, the Lees argue that (1) Vasquez's negligence in striking the line subjects Ziply to liability because it had obtained the Rathdrum Permit for the project in which Ziply agreed to "keep the site safe at all times and perform work in a manner required by City ordinances and other applicable laws"; (2) Ziply's contract with HHS Construction evidences a fiduciary obligation; and (3) Ziply exercised sufficient control over the subcontractors, the scope of work, and the method of work to establish an agency relationship (Dkt. 110 at 2–3, 14). Ziply, in contrast, contends that there is no evidence establishing any of the requisite elements of an agency (Dkt. 93-1 at 3).

The Lees have not met their burden of showing a genuine issue of material fact that an agency relationship existed between Ziply and any of the subcontractors. First, there is no indication that Ziply granted the subcontractors the power to alter Ziply's legal relations. An agent can alter legal relations between the principal and third party when the agent has authority to sign contracts, acquire interest, or act in any way on the principal's behalf. *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 220 (6th Cir. 1992). Here, there is no such evidence.

Absent evidence of authority, the Lees argue that the subcontractors' actions altered Ziply's legal relationship because those actions subjected Ziply to liability to injured third parties (namely, the Lees) thereby demonstrating the subcontractors' power to affect Ziply's legal relations.

**MEMORANDUM DECISION AND ORDER – 9**

(Dkt. 110 at 14). This argument, however, is circular because it assumes the very relationship the Lees must first establish to show an agency. A subcontractor's negligence exposes Ziply to vicarious liability only if an agency relationship exists; that negligence cannot serve as proof of the power to alter Ziply's legal relations.

Likewise, there is no evidence demonstrating a genuine issue of material fact that the subcontractors owed any fiduciary duty to Ziply. The Idaho Supreme Court has ruled that a contractor is a fiduciary when it owes the "purported principal 'the basic obligations of agency: loyalty and obedience'"; examples of fiduciaries include "brokers, factors, attorneys, collection agencies, and selling agencies." *Nelson*, 458 P.3d at 146-47 (quoting Restatement (Second) of Agency § 14N cmt. a (A.L.I. 1958)). Here, no evidence suggests the contractors owed Ziply a duty of loyalty, obedience, or any other fiduciary-type duty. Accordingly, the Lees have failed to satisfy the second element to establish an agency.

Finally, the Lees have failed to establish a genuine issue of material fact regarding the third element of the agency analysis—the right to control. A principal is liable when it retained the right to control the "details, manner, means, or methods of doing the work, as contrasted with the result thereof." *Merrill v. Duffy Reed Constr. Co.*, 353 P.2d 657, 660 (Idaho 1960). The Lees argue that Ziply's right to control the subcontractors' conduct included that: (1) Ziply created a work order defining the scope, technical specifications, and execution of the fiber installation (Dkt. 110 at 17); (2) it controlled whether excavation would occur by trenching or directional drilling (*id.*); (3) it was designated as the "Project Manager" (*id.* at 15); (4) it retained the ability to discontinue services or terminate engagements (*id.* at 15–16); and (5) there is contractual chain between Ziply and the subcontractors (*id.* at 16). The Lees believe these facts demonstrate "Ziply's ongoing

**MEMORANDUM DECISION AND ORDER – 10**

oversight, its ability to direct performance, and its reserved power to discontinue services at will" (*id.* at 15, 16).

The Court is not persuaded that this evidence shows that Ziply controlled the subcontractors' conduct. The mere fact that the work was to be done per Ziply's work order and to its satisfaction does not establish a genuine issue of material fact that any of the subcontractors were Ziply's agents. *See S. Hill Meat Lockers v. Idaho Transp. Dep't*, 573 P.3d 151, 163 (Idaho 2025) (holding transportation department was not in principal–agent relationship with subcontractors merely because it maintained a "supervisory capacity to ensure that the result of the final plans was achieved"). Accordingly, the Lees have failed to create a genuine issue of material fact regarding any element of the agency analysis.

### 2.    Non-Delegable Duty

Another exception to the general rule that a principal is not liable for the acts of an independent contractor is where a principal has a non-delegable duty. *Peone v. Regulus Stud Mills, Inc.*, 744 P.2d 102, 106 (Idaho 1987) (citing Restatement (Second) of Torts §§ 413, 416)). A non-delegable duty is a duty of care which the principal owes to a third party and which the principal cannot discharge by delegating the duty to an independent contractor. *Hunt v. Regence Blueshield of Idaho*, No. CV-02-01082, 2003 WL 22176010, at *6 (Idaho Dist. Ct. June 9, 2003). The Lees argue that Ziply had a non-delegable duty to comply with Idaho statutes, including Idaho Code § 55-2207 (Dkt. 4, 7).

Section 55-2207 provides that a project owner "shall indicate in bid and contract documents the existence of underground facilities known by the project owner to be located within the proposed area of excavation." I.C. § 55-2207(1). The Lees argue that "the unambiguous language of the statute makes clear that Ziply had a duty to indicate in its bid or on its contract documents the 'existence of underground facilities'" and that "there is no evidence in the record to indicate

MEMORANDUM DECISION AND ORDER – 11

that Ziply complied with the statute" (Dkt. 110 at 5). Further, the Lees suggests that Ziply violated the statute because it "failed to initiate 811 dig alert tickets, a necessary step to ensure all existing underground utilities and infrastructure were properly located and clearly marked" (Dkt. 110 at 10).

Ziply replies that § 55-2207(1) only requires it to indicate in its contract document the underground facilities known to it; the plan for the Ziply project clearly provides that the construction contractor has the responsibility to verify existing utilities; and the Lees' argument contradicts both § 55-2207(2), which requires the excavator to use reasonable care including to precisely locate the marked underground facilities by hand digging, and § 55-2205(1)(c), which requires the excavator to provide notice of the excavation "through a one-number notification service" (Dkt. 118 at 12).

The Lees provide no authority, other than the plain language of § 55-2207, to assert Ziply had a non-delegable duty to identify the location of the underground facilities in its documents, and as Ziply notes, § 55-2207(1)'s plain language does not clearly establish a duty to identify all the facilities; rather, it only requires identification of "known" facilities. Regardless, the Court does not need to determine whether § 55-2207 creates a non-delegable duty because the undisputed facts are that all utilities lines were accurately marked before Vasquez and his crew began digging near the Lee residence (Dkt. 93-1 at 10; Dkt. 110 at 19; Dkt. 110-3 ¶ 19). In other words, a failure to identify the underground facilities' locations is not at issue. Accordingly, Ziply cannot be liable as a matter of law for any alleged failure to comply with § 55-2207 or to initiate 811 dig alert tickets to locate the facilities.

The Lees also argue that the Rathdrum Permit created a non-delegable duty to "keep the site safe at all times" and "[to] be responsible for all damage to the site" (Dkt. 110 at 7). The Permit

provides in relevant part that the City's inspection of the work and work site "does not relieve the permittee of the duty to keep the site safe at all times"; the permittee must comply with all City ordinances and other applicable laws; and any "damage or deficiency to the site or within the right-of-way becomes the responsibility of the permittee" (Dkt. 110 at 6) (quoting Rathdrum Permit).

As Ziply notes, however, the Lees cite no authority for the broad proposition that a city permit creates a non-delegable duty on behalf of the permittee to unidentified third parties who may be injured by an independent contractor's actions. Moreover, the Rathdrum Permit's language does not support such a broad duty. Rather, the Permit, at most, requires Ziply to hold the City harmless and reimburse it for any damage occurring to the "site or within the right-of-way." Absent any legal authority, the Court declines to create an exception to the general rule in Idaho that a principal is not liable to a third party for the acts of an independent contractor based on a local government permit.

Finally, the Lees assert Ziply had a non-delegable duty because the Ziply project created unreasonable and peculiar risks which Ziply could not delegate (Dkt. 110 at 7). Idaho has adopted the Restatement (Second) of Torts § 413, which provides that a principal who employs an independent contractor to do work, which creates a "peculiar unreasonable risk of physical harm to others unless special precautions are taken," remains liable for injuries the contractor causes if the principal "(a) fails to provide in the contract that the contractor shall take such precautions, or (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions." *Peone*, 744 P.2d at 104 (quoting § 413). The threshold question is whether the work imposes a peculiar risk in its normal operation which special precautions must counter. *Idaho Waste Sys., Inc. v. U.S. Air Force*, No. 18-cv-0229-SRB-WJE , 2020 WL 697914, at *10 (D. Idaho Jan. 27, 2020). Here, the inquiry is whether "constructing fiber optic cable infrastructure in the

**MEMORANDUM DECISION AND ORDER – 13**

right-of-way where a natural gas main is installed creates a peculiar or unreasonable risk of physical harm" (Dkt. 110 at 8).

A risk is "peculiar" if it differs from the common risks associated with the work to be done. *Peone*, 744 P.2d at 107. "Whether work creates a peculiar risk of physical harm is not the same question as whether work is dangerous." *Fagundes v. State*, 774 P.2d 343, 347 (Idaho 1989). "The peculiar risk doctrine does not encompass taking precautions against ordinary dangers which arise in the course of work." *Id.* at 347–48. For example, the Idaho Supreme Court in *Peone* held that the work of falling a dead tree is dangerous but is not peculiar to the logging industry because it is commonly encountered. 744 P.2d at 107; *see also Fagundes*, 774 P.2d at 347–48 (holding that risk of crashing in wilderness area not peculiar to job which involves flying helicopter over wilderness area); *Ek v. Herrington*, 939 F.2d 839, 844 (9th Cir. 1991) (applying Idaho law to hold that "the risk posed by overloading a logging truck is not a peculiar risk that arises in the normal course of logging and for which special precautions must be taken").

The Lees cite no authority for the proposition that excavating near underground facilities creates an unreasonable and peculiar risk of harm imposing a non-delegable duty on Ziply. Meanwhile, the record shows that encountering gas line strikes is ordinary for underground drilling projects (*see* Dkt. 93-1 at 8; Dkt. 93-2 ¶ 35; Dkt. 110-1 at 139–40). Moreover, to the extent excavating near underground facilities is dangerous, the Idaho Legislature has imposed duties on the excavator to avoid this risk of harm. For example, as noted above, § 55-2207 imposes a duty of reasonable care on the excavator "to avoid damaging underground facilities" including by "hand digging." I.C. § 55-2207(2)(a); *see also* I.C. § 55-2205 (establishing duties for excavator to comply with permit). Indeed, the excavator is in the best position to avoid striking an underground facility.

MEMORANDUM DECISION AND ORDER – 14

For these reasons, the Court declines to adopt a rule that excavating near underground facilities creates an unreasonable and peculiar risk of harm imposing a non-delegable duty on Ziply.

In summary, the Lees have failed to show a genuine issue of material fact that Ziply is liable for the negligent conduct of the independent contractors. Specifically, the Lees have failed to establish a factual question that any subcontractor was Ziply's agent or that Ziply had a non-delegable duty under § 55-2207, the Rathdrum Permit, or for a peculiar risk of harm. Accordingly, Ziply is entitled to summary judgment as a matter of law on the Lees' claims for negligence, vicarious liability, and NIED.

### 3.    Negligent Supervision, Training, and Hiring

The Lees' claim for negligent supervision, training, and hiring against Ziply also fails. The Lees, however, do not and cannot credibly dispute Ziply's argument that Idaho courts have consistently limited claims of negligent supervision to employer-employee relationships and that the existence of such a relationship is a threshold requirement for asserting the claim (*compare* Dkt. 93-1 at 12—13 *with* Dkt. 110 at 18—19). *See, e.g.*, *Rausch v. Pocatello Lumber Co., Inc.*, 14 P.3d 1074, 1080 (Idaho 2000) (noting claim is based on "employer's own negligence in failing to exercise due care to protect third parties from the foreseeable tortious acts of an employee"). Here, the Lees have failed to show a genuine issue of material fact that Ziply has an employment relationship with any of the subcontractors. Accordingly, Ziply is entitled to summary judgment on the Lees' claim for negligent supervision, training, and hiring.

### 4.    Joint and Several Liability

Finally, the Lees' claim for joint and several liability against Ziply fails. Under Idaho law, the doctrine of joint and several liability provides that "a party shall be jointly and severally liable for the fault of another person or entity or for payment of the proportionate share of another party where they were acting in concert or when a person was acting as an agent or servant of another

MEMORANDUM DECISION AND ORDER – 15

party." Idaho Code § 6-803(3), (5); *see also Todd v. Sullivan Construction LLC*, 191 P.3d 196, 204 (Idaho 2008) ("[W]here several people actively participate in any manner in the commission of a tort, not only the actual actor or assailant is liable but all others who aid, abet, counsel or encourage the wrongdoer by words, gestures, looks or signs are equally liable with him to the injured person."). Whether there is an independent cause of action for joint and several liability under Idaho law is unclear. Regardless, as discussed above, the Lees have failed to establish a genuine issue of material fact that any of the subcontractors were Ziply's agents or that Ziply was "acting in concert" with any of them. Accordingly, Ziply is also entitled to summary judgment on the Lees' claim of joint and several liability.

**B.      Avista's Summary Judgment Motion Against the Lees**

Avista moves for summary judgment on the Lees' claims for negligence; negligent supervision, training, and hiring; and the Lee children's NIED claims (Dkt. 94). The Lees, HHS Construction, PG Engineering, and Mastod's oppose Avista's motion. For the reasons discussed below, the Court denies Avista's summary judgment motion, except as to the Lee children's NIED claims.

### 1.      Negligence

The Lees allege that Avista was negligent in responding to the gas leak (Dkt. 5-1). Under Idaho law, a plaintiff bringing a claim for negligence must establish "(1) a duty, recognized by law, requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage." *Alegria v. Payonk*, 619 P.2d 135, 137 (Idaho 1980).

In support of summary judgment, Avista argues that its Gas Emergency and Services Handbook (GESH) undisputedly establishes the applicable standard of care and that because it followed the GESH when investigating the gas leak, it did not breach the standard of care (Dkt. 94-

MEMORANDUM DECISION AND ORDER – 16

2 at 10–14). Both the Lees and the opposing Defendants disagree that the GESH is the exclusive, controlling standard of care. Relying on *Doxstater v. Northwest Cities Gas Co.*, 154 P.2d 498, 504 (Idaho 1944), the Lees argue that Avista is held to a heightened standard of care commensurate with the dangerous character of the work (Dkt. 108 at 4). Meanwhile, the opposing Defendants argue that "allegedly following safety protocols and industry standards does not warrant summary judgment as a matter of law" and that Avista's duty was to respond to the gas leak in a careful and reasonably prudent manner (Dkt. 106 at 3).

The Court agrees that Avista's handbook, GESH, does not conclusively establish the applicable standard of care in this case as a matter of law. Rather, "the standard is what a reasonably prudent man under like circumstances would do." *Low v. Park Price Co.*, 503 P.2d 291, 297 (Idaho 1972) (citing *Albrethson v. Carey Valley Reservoir Co.*, 186 P.2d 853, 858 (Idaho 1947)). Under Idaho law, the degree of care must be commensurate with the danger. *Doxstater*, 154 P.2d at 504; *Oswald v. Costco Wholesale Corp.*, 473 P.3d 809, 824 (Idaho 2020). Although Avista's GESH and the other regulations it cites may help define the applicable standard of care, they do not conclusively establish that standard.[2]

---

[2]    During oral argument, Avista claimed that expert opinion is required—like in a medical malpractice case in Idaho—to establish the applicable standard of care because what a reasonable gas company should have done is not within the common lay knowledge of an average individual. While expert testimony may be useful for the trier of fact when the relevant industry standard is not clearly established, the Court finds no authority to support Avista's assertion the Lees' claims fail as a matter of law absent expert testimony about the standard of care. *See Estate of Kane v. Epley's Inc.*, No. 15-CV-00105-EJL, 2016 WL 7155734, at *5 (D. Idaho Dec. 5, 2016) (noting because relevant industry standard is not clearly established, expert testimony becomes relevant to "provide[] specialized knowledge and expertise concerning the standards applicable to [defendant company] that will assist the trier of fact"); *Rockefeller v. Grabow*, 39 P.3d 577, 587 (Idaho 2001) (holding when standard of care is clearly established by Idaho law, expert testimony is not needed because "the jury [can] readily apply the facts to the legal standard without the assistance of expert testimony"). Although expert testimony is relevant to the standard of care, this Court declines to

Whether Avista complied with the applicable standard of care presents genuine issues of material fact for the jury's resolution. These factual issues include, for example, whether Stevens acted reasonably when he limited his monitoring "to the level of his torso and did not include checking areas above head height where gas can accumulate" (Dkt. 108 at 7); whether Stevens should have checked the residence's concealed spaces, such as the attic, for gas (*id.*); whether testing of the gas migration pathways should have been checked (*id.* at 9); whether Avista's use of bar holing to test for natural gas was reasonable (*id.* at 8); whether Avista should have known its equipment was faulty after receiving a rapid decline in the readings (*id.*); whether obtaining two bar holing samples on the southeast and southwest corners of the Lee residence was reasonable (*id.* at 9); whether Avista should have bar holed around the entire perimeter of the property (*id.*); and whether Avista should have conducted more bar holing in front of the residence (*id.* at 11). Indeed, contrary to Avista's argument that it complied with the applicable standard of care, Avista employee Holden testified that he would not have allowed the Lees back into the residence, as Stevens did, before Holden had "bar holed all the way around the house" and "the job was complete" (Dkt. 108-1 at 92). This testimony, among other disputed facts, creates genuine issues of material fact whether Avista acted reasonably under the circumstances. Accordingly, the Court cannot say, as a matter of law, that Avista did not breach its duty of care to the Lees.

The Lees also argue that the doctrine of res ipsa loquitur applies because Avista had exclusive control over the natural gas and the electric meter and the explosion would not have occurred but for Avista's negligence (Dkt. 108 at 19). The doctrine of res ipsa loquitur is used to

---

adopt a rule requiring expert testimony as a matter of law. Moreover, Avista's assertion that expert testimony is required contradicts its argument that the GESH conclusively establishes the only applicable standard.

**MEMORANDUM DECISION AND ORDER – 18**

"shift[] to the defendant the obligation to produce evidence to explain or rebut the inference of negligence raised by the application of the doctrine." *Hale v. Heninger*, 393 P.2d 718, 722 (Idaho 1964). To invoke the doctrine, the Lees must establish by a preponderance of the evidence that: (1) the agency or instrumentality causing the injury was under the exclusive control and management of the defendant; and (2) the circumstances were such that common knowledge and experience would justify the inference that the accident would not have happened in the absence of negligence." *Harper v. Hoffman*, 523 P.2d 536, 537 (Idaho 1974). Application of res ipsa is "limited to those cases which are within the common knowledge and experience of the average layperson." *Kolln v. Saint Luke's Reg'l Med. Ctr.*, 940 P.2d 1142, 1153 (Idaho 1997).

Here, Avista contends that it did not have exclusive control over the gas or furnace, and the "subject matter of this lawsuit far exceeds common knowledge and experience of a layperson, which necessitates the need for expert testimony" (Dkt. 119 at 18). Although resolution of the Lees' res ipsa loquitur theory is not necessary to resolve Avista's summary judgment motion, the Court expresses some doubt that a gas company's response to a natural gas leak is "within the realm of common knowledge of the average layperson." *See Enriquez v. Idaho Power Co.*, 272 P.3d 534, 540 (Idaho 2012) (declining to apply res ipsa loquitur where alleged negligence involving electrical safety devices was beyond common knowledge); *United States v. Idaho Cnty. Light & Power Coop. Ass'n, Inc.*, No. 17-CV-00391-CWD, 2020 WL 877809, at *6 (D. Idaho Feb. 21, 2020) (noting fire origin and causation typically require expert testimony because they are outside lay understanding); *Kolln*, 940 P.2d at 1153 (holding res ipsa unavailable in medical malpractice actions because such matters are not within the common knowledge and experience of laypersons).

MEMORANDUM DECISION AND ORDER – 19

Regardless, Avista is not entitled to summary judgment on the Lees' negligence claim because there are disputed factual issues whether Avista's employees acted reasonably under the circumstances. Resolution of these facts also bears on whether Avista's conduct caused the explosion.[3] Accordingly, the Court denies Avista's motion with respect to the Lees' negligence claim.

### 2.   Negligent Supervision, Training, and Hiring

The Lees allege that Avista failed to train its employees about the behavior and dangers of natural gas and safety protocols and on how to respond to gas leaks, detect gas in enclosed spaces, mitigate the presence of gas, and calibrate the gas-detection equipment (Dkt. 94-2 at 15–16). Under Idaho law, an employer has a duty to exercise reasonable care to protect third parties from the foreseeable tortious acts of an employee. *Rausch*, 14 P.3d at 1080. In support of its summary judgment motion, Avista argues that "there is no evidence that any Avista employee acted outside the scope of [his] employment in relation to the gas leak" (Dkt. 94-2 at 17). Whether an Avista employee acted outside the scope of his employment, however, is not the correct inquiry. Rather, the inquiry is whether Avista reasonably supervised, trained, and hired its employees who investigated the gas leak. While "negligent supervision liability encompasses conduct of the employee that is *outside* of employment," *Rausch*, 14 P.3d at 1080, Avista cites no authority in support of the proposition that a duty to supervise, train, and hire an employee is limited solely to the employee's conduct outside his employment. Such a limitation would be nonsensical.

---

[3]   Avista's contention that it is not liable for the explosion because "the leak of the fuel source was created by Mastod's installing the fiber optic lines" is misplaced (Dkt. 119 at 10). Idaho law recognizes that there can be more than one cause of the Lees' harm. *Garcia v. Windley*, 164 P.3d 819, 823 (Idaho 2007).

**MEMORANDUM DECISION AND ORDER – 20**

Here, as noted above, there are numerous genuine issues of material fact whether Avista's employees acted reasonably under the circumstances. Conceivably, Avista's alleged conduct in negligently hiring, training, or supervising the Avista employees who failed to detect the gas in the residence may have caused the explosion. The Lees identify facts suggesting that Avista employees might have been able to avoid the explosion if properly trained and supervised. For example, they note that Stevens allegedly failed to inspect closed-off spaces and disregarded Mr. Lee's report of smelling gas and hearing an unusual noise in the furnace (Dkt. 108 at 15). Further, they contend Vern Malesky, an Avista employee who assumed the role of incident commander after Stevens, allegedly lacked the qualifications necessary to supervise Stevens (*id.*). These facts create genuine issues of material fact. Further, the Lees' negligent supervision, training, and hiring claim substantially overlaps with and mirrors many of the disputed factual issues related to their negligence claim. For these reasons, the Court declines to grant Avista summary judgment on the Lees' claim of negligent supervision, training, and hiring.

### 3.    Negligent Infliction of Emotional Distress

The Court, however, grants Avista's summary judgment motion regarding the Lee children's NIED claims. A NIED claim requires the same elements as a common law negligence action—duty, breach, causation, and damages. *Nation v. State, Dep't of Corr.*, 158 P.3d 953, 965–66 (Idaho 2007); *Johnson v. McPhee*, 210 P.3d 563, 574 (Idaho Ct. App. 2009) (citing *Brooks v. Logan*, 903 P.2d 73, 78 (Idaho 1995)). Additionally, however, the plaintiff must demonstrate a physical manifestation of the emotional injury, "which is designed to provide a degree of genuineness that claims of mental harm are not imagined." *Frogley v. Meridian Joint Sch. Dist. No. 2*, 314 P.3d 613, 624 (Idaho 2013) (citing *Czaplicki v. Gooding Joint Sch. Dist. No. 231*, 775 P.2d 640, 646 (Idaho 1989)).

Avista argues that because the Lee children were not present at the scene of the explosion and did not observe the harm inflicted in real time, they cannot prove a bystander claim for NIED (Dkt. 94-2 at 18–19). Avista concedes that Idaho has not adopted the bystander proximity approach to NIED claims (Dkt. 119 at 15). When there is no Idaho law on point, the Court must step into the shoes of the Idaho Supreme Court and "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *NLRB v. Calkins*, 187 F.3d 1080, 1089 (9th Cir. 1999) (citation modified).

The Court need not resolve whether Idaho courts would follow the bystander rule to resolve the children's NIED claims, however, because it concludes they were not foreseeable plaintiffs. "Under Idaho law, 'one owes the duty to every person in our society to use reasonable care to avoid injury to the other person in any situation in which it could be reasonably anticipated or foreseen that a failure to use such care might result in such injury.'" *Henrie v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 395 P.3d 824, 828 (Idaho 2017) (quoting *Doe v. Garcia*, 961 P.2d 1181, 1184 (Idaho 1998)). Accordingly, the question becomes whether a reasonable person would have foreseen that clearing the residence and re-energizing the home would cause the Lee children, who were attending a nearby school, to suffer emotional distress after learning several hours later that the explosion involved their residence.

The Lees ask this Court to impose on Avista a duty to protect their children who were 645 feet from the Lee residence; did not actually observe the explosion; and did not know about the damage to the house or their parents' injuries until hours later (Dkt. 94-1 ¶¶ 76–79). The Lees challenge Avista for not citing any case law to support its assertion that a plaintiff's presence at the scene of the accident or contemporaneous observation of the accident are elements of an NIED

MEMORANDUM DECISION AND ORDER – 22

claim (Dkt. 108 at 17). The Lees, however, cite no case law to the contrary. When asked to recognize a duty not previously recognized, the Idaho Supreme Court instructs courts to consider the following factors:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Nation*, 158 P.3d at 967 (quoting *Rife v. Long*, 908 P.2d 143, 148 (Idaho 1995)).

The determination of whether a duty will arise in a particular instance involves a consideration of policy and the weighing of several factors. *Stoddart v. Pocatello Sch. Dist. No. 25*, 239 P.3d 784, 791 (Idaho 2010). "Normally, the foreseeability of a risk of harm, and thus whether a duty consequently attaches, is a question of fact reserved for the jury." *Id.* "[W]hen the undisputed facts can lead to one reasonable conclusion," however, a court "may rule upon the issue of foreseeability as a matter of law." *Mico Mobile Sales & Leasing, Inc. v. Skyline Corp.*, 546 P.2d 54, 58–59 (Idaho 1975) (citing *Munson v. Idaho Dep't of Highways*, 531 P.2d 1174 (Idaho 1975)).

The Court concludes that, based on these specific facts, the danger to the Lee children was not foreseeable. First, there is nothing in the record to suggest that Avista or any other Defendant was aware that the children were in school nearby. Second, the connection between the explosion of the Lee residence and the children's alleged emotional distress is remote. Although R.L. heard the explosion and saw smoke, he asked his teacher for permission to call his parents to make sure they were okay and was assured they were (Dkt. 108-6 ¶¶ 14–15).

Meanwhile, T.L. did not observe the explosion, although her teacher announced to the class before lunch that there was a gas leak and told them after lunch that a house burned down (*id.* ¶ 78; Dkt. 108-5 at 7). It was not until approximately 3:45 p.m. when the children's grandmother picked

MEMORANDUM DECISION AND ORDER – 23

them up at school—nearly three hours after the incident—that R.L. and T.L. learned that their house was involved in the explosion (Dkt. 94-1 ¶¶ 76, 78; Dkt. 108-5 at 7). Given the significant delay between the explosion and the children learning that their home was affected and the distant location of the school from the incident, the Court concludes that any harm to R.L. and T.L. was not reasonably foreseeable.

Further, the possibility that the Lees might have children who were at a nearby school is too speculative to be reasonably foreseeable. It is undisputed that at the moment of the explosion, neither child knew that their house was involved or that their parents were injured. Imposing a duty under these circumstances would extend liability in a manner inconsistent with the policy of preventing future harm and would create an undue burden on defendants for events that are difficult to predict or control. Therefore, the Court holds that it was unforeseeable as a matter of law that the Lee children would suffer emotional distress when they were not present at the scene of the accident, did not observe the explosion, and did not learn that their residence was affected or that their parents were in harm's way until several hours later.

## C.    HHS Construction's Summary Judgment Motion Against PG Engineering

HHS Construction filed a cross-claim against PG Engineering alleging breach of contract (Dkt. 12 ¶¶ 17–21). It moves for summary judgment on this cross-claim, arguing that PG Engineering breached the parties' Master Service Agreement (MSA) by failing to indemnify and defend it against this action (Dkt. 95). Despite repeatedly tendering HHS Construction's defense and indemnity of this action to PG Engineering under the MSA, PG Engineering has not responded to its tenders (Dkt. 95-3 ¶¶ 14–17).

The MSA provides in relevant part:

> [PG Engineering] shall *indemnify, defend and hold harmless* [HHS Construction], Owner, and each of its officers, employees, principals, agents and Affiliates . . . from and against *any and all claims*, actions, damages, or other

**MEMORANDUM DECISION AND ORDER – 24**

liabilities     (including     reasonable     attorneys'     fees)     for . . . personal injury . . . property damage . . . or other harm for which recovery of damages is sought, suffered by any person or persons . . . that *may arise out of or result from* [PG Engineering's] breach of any of the terms or covenants contained in this Agreement, or by any negligent or strictly liable act . . . in connection with the performance of the Work hereunder."

(Dkt. 95-1 at 5) (emphasis added).

HHS Construction asserts this language is unambiguous (Dkt. 95-1 at 7), and PG Engineering does not dispute that assertion (*see generally* Dkt. 111). Under Idaho law, "[i]n the absence of ambiguity, the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument. Both interpreting an unambiguous contract and determining whether there has been a violation of that contract are "issue[s] of law." *City of Meridian v. Petra Inc.*, 299 P.3d 232, 242 (Idaho 2013) (citation modified); *see also Bonner Cnty. v. Panhandle Rodeo Ass'n*, 620 P.2d 1102, 1106 (Idaho 1980) ("The rule in Idaho is that in the absence of ambiguity, contracts for insurance must be construed as any other and understood in their plain, ordinary and proper sense, according to the meaning derived from the plain wording of the contract."); *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 226 P.3d 1277, 1280 (Idaho 2010) (quotation omitted) (noting interpretation of unambiguous contract is question of law).

HHS Construction argues that based on the MSA's plain language, PG Engineering agreed to defend and indemnify it. In support, HHS Construction relies on *Farber v. State*, 682 P.2d 630 (Idaho 1984), in which the Idaho Supreme Court addressed a contractor's duty to indemnify. In *Farber*, the State hired a contractor for street improvements and entered into an agreement providing that "the contractor shall indemnify and save harmless the [State] from all suits, actions, or claims of any character *brought* because of any injuries or damages received or sustained . . . on account of the operations of the contractor." *Id.* at 631 (emphasis added). A property owner sued

the contractor and the State, alleging claims of negligence and condemnation. *Id.* After the jury found both parties were not liable, the State sought an award of attorneys' fees against the contractor, claiming that the contractor agreed to indemnify the State. *Id.*

The *Farber* court held that "the word 'brought' signifies that the duty to indemnify is triggered when the claim is made and not when and if it is successfully concluded." *Id.* In support, the court noted that "when a claim is made against an indemnitee for which he is entitled to indemnification, the indemnitor is liable for any reasonable expenses incurred by the indemnitee . . . regardless of whether the indemnitee is ultimately held not liable." *Id.* (quoting *Saint Paul Fire & Marine Ins. Co. v. Crosetti Bros.*, 475 P.2d 69, 71 (Or. 1970)). In reaching this conclusion, the court dismissed the contractor's assertion that there is no liability for indemnification absent the establishment of liability. The court reasoned that because the contractor contractually agreed to indemnify and save harmless the State, the contractor was required to "make a choice between defending or paying the defense costs." *Id.* at 632 (citing *Saint Paul Fire & Marine Ins. Co.*, 475 P.2d at 71). Because the contractor did not defend the suit, "it had a duty to pay the [the State's] attorneys' fees and investigative expenses." *Id.*

Here, PG Engineering agreed to "indemnify, defend and hold harmless" HHS Construction "from and against any and all *claims*" that "*may* arise out of or result from . . . any negligent or strictly liable act . . . in connection with the performance of the Work hereunder" (Dkt. 95-1 at 5 (emphasis added)). Under this plain language, the Lees' action alleging claims that may arise out of PG Engineering's conduct triggered PG Engineering's duty to defend and indemnify HHS Construction.

PG Engineering attempts to avoid its duty to defend HHS Construction by arguing that Idaho courts have not extended to subcontractors the rule that an insurer has a duty to defend its

MEMORANDUM DECISION AND ORDER – 26

insured once a third party files a complaint against the insured which reveals potential liability (Dkt. 111 at 7) (citing *Hoyle v. Utica Mut. Ins. Co.*, 48 P.3d 1256, 1264 (Idaho 2002)). Whether the filing of a complaint triggers a subcontractor's duty to defend, however, depends on the language of the parties' indemnification agreement. The caselaw on which PG Engineering relies in support of its argument that it is not required to defend HHS Construction—unless and until there is a finding of negligence—turns on contractual language which is distinguishable from the MSA. *See, e.g.*, *Mountain View Hosp., L.L.C. v. Sahara, Inc.*, No. 07–cv–464–BLW, 2011 WL 4962183, at *29 (D. Idaho Oct. 17, 2011) (noting indemnification provision qualified that claims subject to indemnification *must* be caused by indemnitor's negligent act or omission).

Based on the MSA's plain language, the Court concludes that PG Engineering's duty to defend HHS Construction arose when the Lees filed this action. PG Engineering then breached the MSA when it failed to respond and refused HHS Construction's tenders. Accordingly, HHS Construction is entitled to summary judgment on its breach of contract cross-claim against PG Engineering.

## D.    Plaintiffs' Partial Summary Judgment Motion

The Lees also move for summary judgment against Ziply, HHS Construction, PG Engineering, and Mastod's on their affirmative defense of comparative negligence; on Mastod's affirmative defense of statute of limitations and statute of repose; and to establish the existence of an agency relationship between PG Engineering, Mastod's, and Vasquez (Dkt. 97 at 4, 6–7). In their response, Ziply, Mastod's, and PG Engineering concede the challenged affirmative defenses. Specifically, they concede that the Lees are not comparatively negligent (Dkt. 103 at 2; Dkt. 109 at 3; Dkt. 112 at 5); they filed their action within the statute of limitations (Dkt. 103 at 4; Dkt. 109 at 3; Dkt. 112 at 5); and the statute of repose is inapplicable (Dkt. 109 at 8; Dkt. 112 at 5). Accordingly, the Court limits its analysis to the question of agency.

As discussed above, a principal is generally not liable for the acts of an independent contractor unless narrow exceptions apply. *Brown v. City of Pocatello*, 229 P.3d 1164, 1173 (Idaho 2010). In contrast, "[a] principal is liable for the torts of an agent committed within the scope of the agency relationship." *Sharp v. W.H. Moore, Inc.*, 796 P.2d 506, 512 (Idaho 1990). "[W]hether a given set of facts are sufficient to constitute an agency relationship is a question of law appropriate for this Court's consideration." *Forbush v. Sagecrest Multi Family Prop. Owners' Ass'n, Inc.*, 396 P.3d 1199, 1212 (Idaho 2017) (quoting *Humphries*, 366 P.3d at 1095 n.2). The distinction between an agent and an independent contractor turns primarily on the right to control the manner and means of the work.

An independent contractor is "one who, in the course of an independent employment, undertakes to perform work subject to the control of the person for whom the work is done only as to the result or product of the work, and not as to the means or methods used." *Merrill*, 353 P.2d at 660. A principal may be liable for the negligent acts of an independent contractor if the principal has retained "the right to control and direct the activities of the employee, or the power to control the details of the work to be performed and to determine how it shall be done, and whether it shall stop or continue." *Id.* (quoting *Pinson v. Minidoka Hwy. Dist.*, 106 P.2d 1020, 1022 (Idaho 1940)). An independent contractor relationship is not disturbed, however, because "the work is to be done under directions and to the satisfaction of certain persons representing the principal" or based upon "[t]he method of payment" or "[t]he right of supervision, if retained." *Id.* at 659–60. Idaho courts have also noted that whether the worker "furnishes his own equipment" or "pays his expenses" is relevant in determining whether an employer–employee relationship exists. *Id.* at 660.

The Lees argue that there are no genuine issues of material fact that Mastod's and Vasquez were PG Engineering's agents and that PG Engineering is liable for their negligence (Dkt. 97 at

MEMORANDUM DECISION AND ORDER – 28

7–8). The Lees emphasize that PG Engineering "engaged" Mastod's to assist it with the boring portion of the project and that PG Engineering "was on the jobsite daily and instructed the crew how it was to complete the job" (Dkt. 120 at 4). The Lees also point to PG Engineering's agreement with HHS Construction in which PG Engineering acknowledges that it was responsible for the "'actions, omissions, and work' of Mastod['s]" and for the job site (Dkt. 120 at 4).

PG Engineering disputes the Lees' characterization of its involvement. It asserts that the role of its foreman, Giovanni Calderin, was primarily to coordinate "the logistics regarding movement of the crews to a particular area" not to direct the technical means and methods of drilling; it lacked the technical expertise to operate the boring equipment and to exercise the type of control required to establish agency; and Mastod's—rather than PG Engineering—retained operational authority over Vasquez and his crew (Dkt. 98-1 at 272, 284; Dkt. 112 at 9). Mastod's, however, testified that Vasquez "was to get a crew together and work with [Calderin] as a contractor for Mastod's" (Dkt. 98-1 at 775). This testimony is consistent with Calderin's testimony that PG Engineering provided Vasquez's crew "with the work and instructed them [on] how it had to be completed" (*id.* at 272).

Mastod's in turn, contends that its relationship with Vasquez was that of contractor and sub-contractor—not principal–agent (Dkt. 109 at 2–3). It emphasizes that Vasquez assembled his own crew and performed the drilling work (Dkt. 98-1 at 775). The record also reflects, however, that Mastod's furnished equipment for Vasquez to use for drilling operations (Dkt. 109 at 7; Dkt. 98-1 at 797); Vasquez was "the only person [Mastod's] had working for it" (Dkt. 98-1 at 775); Vasquez represented himself as being in a partnership with Mastod's (*id.* at 271; Dkt. 101 at 7); and Mastod's role in the Ziply project was as a "service provider," that being a "[c]ontractor that would work on site" (Dkt. 98-1 at 775).

**MEMORANDUM DECISION AND ORDER – 29**

At the same time, certain facts support the competing view that no agency relationship existed between PG Engineering and Mastod's or Vasquez, including that PG Engineering contracted only with Mastod's—not Vasquez (Dkt. 112 at 8–9); Vasquez and his crew were paid by Mastod's (*id.* at 9); the compensation method used—payment per foot or per item installed—is indicative of an independent contractor relationship because compensation was tied to results achieved rather than time spent or methods employed (*id.* at 9); Mastod's was responsible for maintaining its crew's housing and equipment (*id.* at 9; Dkt. 98-1 at 271); and Mastod's provided PG Engineering with a Form W-9 for payment (Dkt. 112 at 9).

These competing characterizations reveal genuine disputes of material fact concerning the right to control Vasquez's physical conduct. The evidence shows that PG Engineering's personnel were present daily and provided direction to the crew (Dkt. 98-1 at 272), but the record also suggests that such direction may have been limited to coordination and project sequencing rather than the technical details of drilling (Dkt. 98-1 at 284). "Where an employer controls the performance of the person employed to do certain work, as well as the result to be achieved, the servant is an agent, and the employer will be liable for its authorized acts" *Melichar v. State Farm Fire & Cas. Co.*, 152 P.3d 587, 593–94 (Idaho 2007). But where the employer "retains control only as to the result to be achieved" and thus "has no control over how the servant performs the contract," the "servant is an independent contractor." *Id.* at 594. Reasonable minds could differ as to whether PG Engineering's control over the jobsite was sufficient to give rise to an agency relationship. *See Merrill*, 353 P.2d at 662 ("Where the facts are in conflict as to the actual relationship existing, it becomes the duty of the trier of the facts to determine the ultimate fact as to whether the relationship is that of employer and employee or principal and independent contractor.").

**MEMORANDUM DECISION AND ORDER – 30**

Likewise, Mastod's provision of equipment and identification of Vasquez as working on its behalf suggest retained authority (Dkt. 98-1 at 775, 797), yet Mastod's maintains Vasquez operated independently in assembling and supervising his crew (Dkt. 109 at 6). A reasonable jury could draw different inferences from this evidence regarding which entity possessed the right to control the manner and means of the work. Accordingly, the Court cannot conclude as a matter of law that an agency relationship existed between PG Engineering and Mastod's.

While the identity of the principal presents numerous factual questions, one conclusion does follow as a matter of law—Vasquez was either an agent of PG Engineering, Mastod's, or both. The undisputed facts establish that Vasquez did not operate in isolation. Vasquez represented himself as being in a partnership with Mastod's (Dkt. 98-1 at 271); some believed Vasquez was Mastod's foreman (*see, e.g.*, Dkt. 94-1 ¶ 8); no written agreement between Mastod's and Vasquez has been produced[4] (Dkt. 120 at 4); Mastod's engaged with PG Engineering through Vasquez, who had previously worked with Calderin (Dkt. 98-1 at 774); Mastod's "coordinated and rented equipment for use by [Vasquez] on the project" (Dkt. 109 at 7); "the only person [Mastod's] had working for [it]" was Vasquez—it had no other employees (Dkt. 98-1 at 766, 775); and Mastod's had never installed fiber-optic cable before the Ziply project (*id.* at 773). When asked what Mastod's role in the Ziply project was, its Rule 30(b)(6) designee testified that it "was supposed to provide the contractor that will work on the [Ziply] project" (Dkt. 98-1 at 771). The only reasonable inference from these undisputed facts is that Vasquez was acting on behalf of a

---

[4]    In Mastod's Rule 30(b)(6) deposition, Mayo Areola frequently described Vasquez a "contractor" and stated that he "sign[ed] a[] service provider agreement and [Vasquez] was the contractor who work[ed] for PG [Engineering]" (Dkt. 98-1 at 770). At oral arguments, counsel for Mastod's conceded that there is no written contract between Mastod's and Vasquez in the record.

**MEMORANDUM DECISION AND ORDER – 31**

principal during the drilling operations. Whether that principal was PG Engineering, Mastod's, or both presents a question for the jury.

## E.      Remaining Motions

Other pending motions include Plaintiffs' Motion to Strike Avista's Reply Brief (Dkt. 125); Avista's Motion to Strike the Lees' Errata to the Declaration of Nina Scotti (Dkts. 127, 128); and Avista's Motion to Shorten Time to Hear its Motion to Strike (Dkt. 129). The Court denies these motions as moot.

Avista filed its reply in support of summary judgment on August 22, 2025 (Dkt. 119). Nearly six months later—and approximately two weeks before the hearing—the Lees' moved to strike Avista's reply and certain declarations, claiming Avista raised a new argument in its reply regarding the existence of a duty (Dkt. 125-1 at 3). The Lees subsequently filed a sur-reply couched as a supplemental opposition addressing duty (Dkt. 126). The Lees also filed an Errata to the Declaration of Nina Scotti (Dkt. 127) in response to Avista's criticisms concerning Scotti's citations to certain code provisions (Dkt. 119 at 5–7). The Lees' filings then prompted Avista to move to strike the errata and related materials and to seek an order shortening time to address those issues at the hearing (Dkts. 128, 129).

The Court notes that the record does not support the Lees' contention that Avista argued it owed no duty. To the contrary, Avista consistently framed its arguments as challenging breach and causation (Dkt. 94-2 at 3; Dkt. 119 at 2). Further, the Lees did not seek leave before filing a supplemental opposition or errata, as required by Local Rule 7.1(d). Regardless, the motions are moot because the Court resolved Avista's summary judgment motion on the merits without considering the parties' collateral motions. The Court did not rely on any challenged materials in reaching its decision, which does not turn on the procedural disputes raised in the parties'

respective motions to strike. Accordingly, the Court denies Plaintiffs' Motion to Strike (Dkt. 125), Avista's Motion to Strike (Dkt. 128), and Avista's Motion to Shorten Time (Dkt. 129) as moot.

## IV.   ORDER

**IT IS ORDERED that:**

1.   Defendant Ziply's Motion for Summary Judgment (Dkt. 93) is **GRANTED**.

2.   Avista's Motion for Summary Judgment (Dkt. 94) is **GRANTED** in part and **DENIED** in part.

3.   HHS Construction's Motion for Summary Judgment against PG Engineering (Dkt. 95) is **GRANTED**.

4.   Plaintiffs' Motion for Summary Judgment (Dkt. 96) is **GRANTED** in part and **DENIED** in part.

5.   Plaintiffs' Motion to Strike Avista's Reply Brief (Dkt. 125) is **DENIED** as **MOOT**.

6.   Avista's Motion to Strike Plaintiffs' Errata (Dkt. 128) is **DENIED** as **MOOT**.

7.   Avista's Motion to Shorten Time to Hear its Motion to Strike (Dkt. 129) is **DENIED** as **MOOT**.

DATED: March 25, 2026

Amanda K. Brailsford
U.S. District Court Judge